CENTURY THEATERS, INC., d/b/a CENTURY
STEREO THEATER, an Arkansas Corporation
*v.* STATE of Arkansas

CR 81-81                                   625 S.W. 2d 511

Supreme Court of Arkansas
Opinion delivered December 21, 1981

*John Wesley Hall, Jr.* and *R. W. Laster,* for appellant.

*Steve Clark,* Atty. Gen., by: *Victra L. Fewell,* Asst. Atty. Gen., for appellee.

ROBERT H. DUDLEY, Justice. This appeal is from a conviction of promoting obscene material. Ark. Stat. Ann. § 41-3503 (Repl. 1977). Appellant Century Theaters operates an establishment in Little Rock euphemistically labeled "adult" entertainment. As a part of the fare "peepshows" or short films are exhibited in a series of one-person booths. The films, of seven to ten minutes' duration, are on a continuous reel. To view one of them the customer places a quarter in a coin slot and begins watching from wherever it happens to start, which probably is not at the beginning. On some occasions titles give the name of the film while on other occasions they will be labeled "Two men/one woman" or "One man/one woman" and at other times they have no titles.

On April 16, 1980, Detectives Howell and McGuire, members of the vice squad, went to the Century Theater to view films. They saw a number of films and thought that four were obscene. Both detectives looked at the film in booth 3 while McGuire alone viewed the films in booths 5, 9 and 10. They returned on the morning of April 18 but only McGuire saw all four films. They then went before a circuit judge to obtain a search warrant. Detective McGuire, after describing the building and its location, testified that about one hour earlier, the film in booth 3 showed a female performing oral sex upon a male and penetration was shown. He testified that the film showing in booth 5

reflected two females performing oral sex, each upon the other, with actual penetration being shown. His testimony was that the film in booth 9 showed four male homosexuals engaged in sexual activity, all at the same time, with actual penetration. He testified that the film in booth 10 showed two females and one male involved in oral sex acts with actual penetration. Detective Howell testified that he saw the film in booth 3 and it showed a male and female engage first in sexual intercourse and then in oral sex with penetration being shown on both occasions. The search warrant was then issued to authorize the search of booths 3, 5, 9 and 10 of the described building to seize "motion picture films depicting hardcord sexual contact including actual penetration." The last sentence provided "The executing officers must seize only films which they have previously viewed and described in their recorded testimony."

After obtaining the warrant the two detectives returned to appellant's building, identified themselves to an employee, and gave him a copy of the warrant. The three of them went to the booths where the employee removed the films and handed them to the detectives. Later, they again viewed them and placed them in storage. By the time of trial Detective McGuire was deceased and Detective Howell could testify only about the one film he had seen.

The appellant questions whether (1) the testimony of probable cause was adequate, (2) the warrant was properly executed, (3) the warrant allowed seizure of protected materials and (4) a juror should have been excused for cause.

The first issue is whether probable cause was adequately shown for the issuance of the warrant. Rule 13.1 of the Arkansas Rules of Criminal Procedure Vol. 4A (Repl. 1977) sets out the requirements for the issuance of a search warrant. Section (b) is relevant to the point at issue —

The application for a search warrant shall describe with particularity the persons or places to be searched and the persons or things to be seized, and shall be supported by one (1) or more affidavits or recorded testimony under oath before a judicial officer particu-

larly setting forth the facts and circumstances tending to show that such persons or things are in the places, or the things are in possession of the person to be searched . . .

The constitutional issue is how the Fourth Amendment should be construed and applied when the search and seizure involves materials which are presumptively under the protection of the First Amendment. The Supreme Court of the United States in *Zurcher* v. *Stanford Daily*, 436 U.S. 547 at 564 (1978) sets out the rationale and the ruling as follows:

> It is true that the struggle from which the Fourth Amendment emerged "is largely a history of conflict between the Crown and the press," *Stanford* v. *Texas,* 379 U.S. 476, 482 (1965), and that in issuing warrants and determining the reasonableness of a search, state and federal magistrates should be aware that "unrestricted power of search and seizure could also be an instrument for stifling liberty of expression." *Marcus* v. *Search Warrant,* 367 U.S. 717, 729 (1961). Where the materials sought to be seized may be protected by the First Amendment, the requirements of the Fourth Amendment must be applied with "scrupulous exactitude." *Standord* v. *Texas,* supra, at 485. "A seizure reasonable as to one type of material in one setting may be unreasonable in a different setting or with respect to another kind of material." *Roaden* v. *Kentucky,* 413 U.S. 496, 501 (1973). Hence, in *Stanford* v. *Texas,* the Court invalidated a warrant authorizing the search of a private home for all books, records, and other materials relating to the Communist Party, on the ground that whether or not the warrant would have been sufficient in other contexts, it authorized the searchers to rummage among and make judgments about books and papers and was the functional equivalent of a general warrant, one of the principal targets of the Fourth Amendment. Where presumptively protected materials are sought to be seized, the warrant requirement should be administered to leave as little as possible to the discretion or whim of the officer in the field.

Similarly, where seizure is sought of allegedly obscene materials, the judgment of the arresting officer alone is insufficient to justify issuance of a search warrant or a seizure without a warrant incident to arrest. The procedure for determining probable cause must afford an opportunity for the judicial officer to "focus searchingly on the question of obscenity." *Marcus* v. *Search Warrant, supra*, at 732; *A Quantity of Books* v. *Kansas,* 378 U.S. 205, 210 (1964); *Lee Art Theatre, Inc.* v. *Virginia,* 392 U.S. 636, 637 (1968); *Roaden* v. *Kentucky, supra*, at 502; *Heller* v. *New York,* 413 U.S. 483, 489 (1973).

Hence, at the time the warrant was requested the judge had to "focus searchingly" on the question of whether there was probable cause to believe that a violation of the obscenity laws had occurred. However, a showing of "probable cause requires much less evidence than a finding of guilt requires . . . " *United States* v. *Beck,* 431 F. 2d 536 at 538 (5th Cir. 1970). "In dealing with probable cause . . . as the very name implies, we deal with probabilities." *Brinegar* v. *United States,* 338 U.S. 160 at 175 (1949).

In *Miller* v. *California,* 413 U.S. 15 (1973), the Supreme Court reaffirmed the principle established in *Roth* v. *United States,* 354 U.S. 476 (1957) that the First Amendment does not protect obscene material and announced "basic guidelines for the trier of fact" on the issue of obscenity. The court also gave guidance to the states for statutory regulation of obscene materials. Our General Assembly relied on that language when enacting a part of Ark. Stat. Ann. § 41-3502 (Repl. 1977).

(6) "Obscene material" means that material which:
(a) Depicts or describes in a patently offensive manner nudity, sadomasochistic abuse, sexual excitement, sexual conduct, or hard-core sexual conduct;
(b) Taken as a whole, appeals to the prurient interest of the average person, applying contemporary state-wide standards; and

(c)   Taken as a whole, lacks serious literary, artistic, political, or scientific value.

(3)   "Hard-core sexual conduct" means patently offensive acts, exhibitions, representations, depictions, or descriptions of:
(a)   Intrusions, however slight, actual or simulated, by any object, any part of an animal's body, or any part of a person's body into the genital or anal openings of any person's body; or
(b)   Cunnilingus, fellatio, anilingus, bestiality, lewd exhibition of genitals, or excretory functions, actual or simulated.

The testimony of Detectives McGuire and Howell in relation to the search warrant meets the statutory test of "hard-core sexual conduct" as a depiction of "intrusions . . . by any part of a person's body into the genital . . . openings of any person's body," and specifically includes "cunnilingus" and "fellatio." We affirm the holding of the trial court that their testimony was sufficient to meet the statutory definition of "hard-core sexual conduct."

In addition, in order to meet the complete test of "obscene material" the judge was obligated to make a preliminary determination, pursuant to § 41-3502 (6) (b) and (c), that the films of hardcore sexual conduct "taken as a whole" appealed to the prurient interest of the average person, applying contemporary statewide standards, and that they lacked serious literary, artistic, political, or scientific value.

The judge was entitled to use his common sense. He knew that the place to be searched was a theater and that movies were being shown to patrons in individual booths. Ordinary intelligence would dictate this was one method of showing hardcore pornographic movies. He knew, from the description of the films, and as a member of the community that by statewide standards the films would appeal to the prurient interests of the average person. The testimony describing the films created a probability that no literary, artistic, political or scientific values were shown. We affirm

the holding of the trial court in denying the motion to suppress. The judge who issued the warrant decided for himself the persuasiveness of the facts to show probable cause that obscenity laws were being violated.

Appellant next contends that the search warrant should be suppressed for the detectives' failure to adhere to the terms of the warrant which provided that "The officers executing the warrant must seize only films which they have previously viewed and described in their recorded testimony." This sentence is synonymous with the rest of the warrant which authorized the officers to seize only the films in booths 3, 5, 9 and 10. The testimony is uncontradicted that the films were taken only from these four booths and there is no failure to adhere to the terms of the warrant during the search.

Appellant argues that the films from booths 5, 9 and 10 were erroneously admitted into evidence because a proper foundation was not laid. It contends that only Detective McGuire viewed these films before seizure and therefore he was the only person who could have laid a proper foundation. We affirm the trial court's holding that the facts, taken as a whole, satisfy the conditions precedent to admissibility pursuant to Rule 901, Ark. Unif. Rules of Evid., Ark. Stat. Ann. § 28-1001 (Repl. 1979).

Detective Howell testified that McGuire viewed these three films on the 16th and again on the 18th. He testified without objection at the suppression hearing that McGuire told him the pictures he saw on the 18th were the same ones he had seen on the 16th. The testimony of now deceased McGuire to secure the search warrant was given about one hour after viewing the films. That testimony describes the differing hardcore pornographic acts depicted in each of the films and it gives the number of the booth in which each film was being shown. The seizure and the final viewing were described by Detective Howell as follows:

Q. Would you tell the Court what you did then.
A. We entered the theater and the man working the desk, we advised him — identified ourselves as to who

we were, gave him a copy of the search and seizure warrant we obtained that morning and told him specifically which films we wanted. We went with him to the booths. He went in the booths and took the film out and gave them to us.

Q. You did not view the film before you took possession of it?

A. Not at that time, no, sir.

Q. And did you view them later?

A. Yes, sir, we did.

Q. And how much later?

A. I don't recall whether it was the same day or the next day. They were stored — The films were stored in the Little Rock Property Office.

The appellant admitted that the films shown in evidence were the ones seized. We affirm the trial court in ruling that there was sufficient evidence to support the claim that the films are the ones described in the search warrant.

Appellant contends that the phrase "hard-core sexual contact" found in the warrant rather than the statutory "hard-core sexual conduct" made the warrant general and thus authorized the seizure of protected materials. The rationale of this argument is that the words "sexual conduct" in an earlier statute were declared to be over-broad in *Wild Cinemas of Little Rock, Inc.* v. *Bentley*, 499 F. Supp. 655 (E. D. Ark. 1980) and by comparison, this warrant should be declared void. We reject that contention because the term in the search warrant also contained the following qualifying language: " . . . including actual penetration." This qualifying language coupled with the term used make clear that the warrant was not a general warrant which included constitutionally protected materials.

The final point for reversal urged by appellant is that the trial court erred in not granting its motion to challenge for cause a prospective juror. However, the record does not reflect that appellant exercised any peremptory challenges or that it was forced to accept a juror against its wishes. We find no reversible error when the record fails to disclose that

an undesirable juror was forced upon an objecting party. *Conley* v. *State,* 270 Ark. 886, 607 S.W. 2d 328 (1980).

Affirmed.